IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA

GLOBAL INNOVATIVE CONCEPTS,
LLC; A.I. FIRST ALABAMA, LLC; ALLEN      CASE NO.: 5:23-cv-00069-FL
KILGORE,

     Plaintiffs,

v.

STATE OF FLORIDA, DIVISION OF
EMERGENCY MANAGEMENT,

     Defendant.

_____/

**MEMORANDUM IN OPPOSITION TO DEFENDANT,**
**STATE OF FLORIDA DIVISION OF EMERGENCY MANAGEMENT'S,**
**<u>MOTION TO DISMISS OR TRANSFER VENUE</u>**

     Plaintiffs, Global Innovative Concepts, LLC; A.I. First Alabama, LLC; and Allen Kilgore (collectively the "Plaintiffs"), hereby file their response in opposition to Defendant's, State of Florida Division of Emergency Management's ("FDEM"), Motion to Dismiss or Transfer Venue (the "Motion").

### I.    NATURE OF THE CASE

     This case involves two contractual transactions between Essential Diagnostics, LLC ("Essential") – a North Carolina business, and Florida's Division of Emergency Management ("FDEM"). As FDEM states in the Motion, "FDEM does not dispute that it entered into two contracts with Essential in 2020 for the purchase of 600,000 COVID test kits for a total of $6.6 million." [Motion, sec. II, pg. 2]. These contracts were executed during the height of the COVID-19 pandemic. FDEM breached both contracts. *See* Compl. ¶¶ 19, 36, 43, 50, 56. After those breaches, Essential assigned all its legal claims against FDEM to Global Innovative Concepts,

1

LLC ("Global"). *See* Compl. ¶¶ 8, 47, 53; Compl., Ex. A. Plaintiff, Global, stepped into the shoes of Essential to assert breaches of the contracts. In the alternative, and due solely to pre-suit positions taken by FDEM regarding these contracts, Plaintiffs, A.I First Alabama, LLC ("AI First") and Allen Kilgore, assert breach of contract claims. For the reasons set forth below, the Court should deny the Motion.

## II. STATEMENT OF THE CASE AND SUMMARY OF THE ARGUMENT

When the State of Florida was in dire need of COVID test kits, it decided to contract with a North Carolina business (Essential) to urgently obtain test kits. A State of Florida government official, with legislative and contractual authority, signed a contract in wet ink that provided for exclusive jurisdiction in North Carolina. Two days later, the State of Florida agreed to a second contract with Essential on virtually identical terms and conditions.

On March 7, 2020—a year that everyone wishes to forget, but likely will not—the Governor of Florida ordered the Director of FDEM to execute Florida's Comprehensive Emergency Management Plan to cope with the COVID-19 pandemic. *See* Executive Order No. 20-52 ("EO No. 20-52") attached as **Exhibit "A."**[1] Within a matter of days, on March 10, 2020, Jared Moskowitz—the Director of FDEM—issued an Emergency Order suspending the effect of any statute, rule, or order that would prevent, hinder, or delay FDEM's ability to procure, *inter alia*, necessary supplies, commodities, and services to timely execute Florida's COVID-19 Emergency Management Plan. *See* DEM Order No. 20-001 ("FDEM Order No. 20-001") attached as **Exhibit "B."**[2] Less than two weeks later, FDEM did just that—it entered into two contracts

---

[1] The court may consider matters of judicial notice without converting a motion to dismiss into one for summary judgment. *Shore v. Charlotte-Mecklenburg Hosp. Auth.*, 412 F. Supp. 3d 568, 573 (M.D.N.C. 2019) (internal citations omitted). Specifically, the Court may take judicial notice of public documents and government documents because they can be readily determined from sources whose accuracy cannot reasonably be questioned. *Shore*, 412 F. Supp. 3d at 573.

[2] *Shore*, 412 F. Supp. 3d at 573 (judicial notice).

with Essential.  FDEM agreed to the terms and conditions in Essential's Purchase Order forms, presumably, so that FDEM's ability to procure COVID test kits was not prevented, hindered, or delayed.  *See* Compl., Exs. B and D.

FDEM did not insist on using its own purported terms and conditions (or any others) because those terms would have hindered its ability to timely execute an effective response to the COVID-19 pandemic pursuant to EO No. 20-52 and FDEM Order No. 20-001.  FDEM's Motion offers no credible argument within the four corners of the Complaint that Plaintiffs ever viewed, received, or accepted other terms and conditions, such as the "MyFloridaMarketplace Terms and Conditions" or the "PUR1000."  Plaintiffs have properly pleaded all terms and conditions <u>upon which</u> their breach of contract claims rest.  A battle of the forms analysis is unnecessary, first and foremost due to EO No. 20-52 and FDEM Order No. 20-001, but especially (a) at the dismissal stage, (b) within the four corners of the Complaint, and (c) drawing all inferences in Plaintiffs' favor.  The terms and conditions in Essential's Purchase Order forms govern this dispute.

Despite EO No. 20-52 and FDEM Order No. 20-001, which FDEM was <u>clearly aware of</u> (and which is properly judicially noticed by this Court), FDEM bases virtually its entire Motion and all arguments on the contention that FDEM did not have authority to agree to Essential's terms and conditions.  In fact, in the Motion, "FDEM vehemently denies that it agreed—indeed, that it was even legally able to agree—to Essential's proposed terms and conditions …" [Motion, sec. II, pg. 2].  This is an egregious misrepresentation to the Court.  FDEM <u>had actual knowledge</u> that the Governor of Florida, and FDEM itself, suspended the effect of <u>any</u> statute, rule, or order that would prevent, hinder, or delay FDEM's ability to procure, *inter alia*, necessary supplies, commodities, and services (such as COVID test kits) to timely manage the COVID pandemic.  FDEM's egregious misrepresentation discredits its entire Motion.  FDEM's arguments, based upon its own

purported terms and conditions, should be disposed of summarily. The Court should deny the Motion on this basis alone.

On or about March 22, 2020, FDEM indisputably signed a purchase order with Essential to purchase 200,000 COVID viral sample collection kits ("test kits") for $2,200,000 ("PO#1"). *See* Compl., Ex. B. PO#1 expressly provided for jurisdiction and venue in North Carolina. Compl. Ex. B, sect. 13. Essential, swiftly, delivered the 200,000 test kits under PO#1 to FDEM. *See* Compl. ¶ 17. FDEM accepted delivery and quickly confirmed that the test kits had been vetted and cleared by government authorities. Compl. ¶ 18; Compl. Ex. C. To date, FDEM has failed to pay for PO#1 and breached the contract. Compl. 19, 43, 50. In the Complaint, for PO#1, Plaintiffs properly pleaded jurisdiction, venue, offer, acceptance, consideration, a valid binding agreement, and breach of contract.

A few days later, on or about March 25, 2020, FDEM accepted and agreed to a second purchase order with Essential to purchase 400,000 COVID test kits for $4,400,000 ("PO#2"). *See* Compl. ¶¶ 22–31; Compl., Ex. D. PO#2 was Essential's offer, containing virtually identical terms and conditions as PO#1, including jurisdiction and venue in North Carolina. Compl. Ex. D. While PO#2 appears to be unsigned, FDEM accepted and confirmed PO#2 through written emails and an immediate payment of 50% of the contractual obligation. Compl. ¶¶ 26–29. Essential immediately paid the costs of, and procured, the test kits and, a few weeks later, shipped the test kits to the United States for delivery to FDEM in Tallahassee, Florida. Compl. ¶ 31. FDEM breached PO#2 by refusing to accept delivery and failing to pay the remaining balance owed. Compl. ¶¶ 36, 56, 64, 72, 81, 92, 103. In the Complaint, for PO#2, Plaintiffs properly pleaded jurisdiction, venue, offer, acceptance, consideration, a valid binding agreement, and breach of contract.

4

As noted above, EO No. 20-52 and FDEM Order No. 20-001 summarily defeat FDEM's arguments regarding forum, venue, personal jurisdiction, and sovereign immunity, because FDEM clearly, expressly, and purposefully availed itself of conducting business with a North Carolina entity and waived any arguments to the contrary. Nevertheless, FDEM's Motion is likewise defeated by considering other relevant legal factors. The expressly selected forum is North Carolina. The entire lawsuit revolves around contracts with a North Carolina business. FDEM failed to pay a North Carolina business. A North Carolina business was damaged as a result. When FDEM refused delivery of the PO#2 test kits, the products were stored in a warehouse in North Carolina. Compl. ¶ 36. FDEM's Motion wholly ignores this specific allegation in the Complaint, along with other above factors and allegations. FDEM, instead, further discredits itself with blatant misrepresentations such as, "The test kits at issue are not alleged to have been imported through North Carolina nor are they alleged to be located in North Carolina currently or at any other time." [Motion, sec. IV, pg. 11)].

Lastly, FDEM's argument that the Assignment from Essential to Global is invalid is completely baseless. FDEM apparently confuses (1) an assignment of legal claims after a violation has occurred with, (2) an assignment of duties and obligations during the contracts themselves. Not only have Plaintiffs pleaded that, at all relevant times, they were working with Essential as agents of Essential, but FDEM's Motion admits, for example, that there was "a clear indication that Kilgore … was negotiating on behalf of Essential …" [Motion, sec. IX, pg. 26]. Moreover, the Motion highlights several areas where Plaintiffs clearly pleaded, they were working together as agents of Essential, and not as subcontractors or assignees of obligations within the contracts. The Assignment as pleaded, and attached to the Complaint, clearly assigns only legal causes of

action against FDEM. The Assignment is legally valid and permissible under North Carolina law. FDEM's Motion fails to satisfy any grounds for dismissal based upon the Assignment.

Pursuant to the well-pleaded allegations in, and the exhibits attached to, the Complaint, along with EO No. 20-52, FDEM Order No. 20-001, and Essential's express terms and conditions, Plaintiffs have made a prima facie showing of valid binding contracts, of personal jurisdiction over FDEM in North Carolina, and of proper venue in the Eastern District of North Carolina. Plaintiffs have demonstrated, as a matter of law, that FDEM waived sovereign immunity. FDEM, furthermore, has failed to shoulder its burden of demonstrating that the convenience to the parties and the interests of justice <u>strongly</u> favor transfer of this action. The Court should deny the Motion in its entirety.

### III.    MOTION TO DISMISS STANDARD

"The Federal Rules of Civil Procedure erect a powerful presumption against rejecting pleadings for failure to state a claim." *Morgan v. City of Rawlins*, 792 F.2d 975, 978 (10th Cir. 1986). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017). "When ruling on a motion to dismiss, courts must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017). Also, "a complaint is to be construed liberally so as to do substantial justice." *Hall*, 846 F.3d at 765.

A complaint, in sum, is sufficient to withstand a motion to dismiss if it states a claim that is plausible on its face, such that the defendant has fair notice of what the claim is and the grounds on which it rests. *Hall*, 846 F.3d at 765.

## IV. FDEM WAIVED SOVEREIGN IMMUNITY AND ACCEPTED ESSENTIAL'S TERMS AND CONDITIONS OF SALE

### a. FDEM waived Sovereign Immunity.

FDEM waived sovereign immunity, as a matter of law, when it entered into a contract with Plaintiffs on or about March 22, 2020, regarding PO#1 and on or about March 24-25, 2020, regarding PO#2. Unlike Florida's express, statutory waiver of sovereign immunity regarding tort claims, waiver by contract is an implied waiver that was recognized by the Supreme Court of Florida in 1984. In *Pan-Am Tobacco Corp. v. Dep't of Corr.,* the Supreme Court of Florida held that Florida waives the defense of sovereign immunity when it enters into an express, written contract:

> Where the legislature has, by general law, authorized entities of the state to enter into contract or to undertake those activities which, as a matter of practicality, require entering into contract, the legislature has clearly intended that such contracts be valid and binding on both parties. As a matter of law, the state must be obligated to the private citizen or the legislative authorization for such action is void and meaningless. *We therefore hold that where the state has entered into a contract fairly authorized by the powers granted by general law, the defense of sovereign immunity will not protect the state from action arising from the state's breach of that contract*.

*Pan-Am Tobacco Corp. v. Dep't of Corr.*, 471 So. 2d 4, 5 (Fla. 1984) (emphasis added); *see also Posen Const., Inc. v. Lee Cnty.*, 921 F. Supp. 2d 1350, 1356 (M.D. Fla. 2013) ("In the seminal case discussing state sovereign immunity in contract actions, the Florida Supreme Court held that the legislature had implicitly waived its sovereign immunity by authorizing the state to enter into valid contracts with private parties."); *Great Am. Ins. Co. v. Sch. Bd. of Broward Cnty., Fla.*, No. 09-61636-CIV, 2010 WL 4366865, at *6 (S.D. Fla. July 30, 2010), *report and recommendation adopted*, No. 09-61636-CIV, 2010 WL 11505944 (S.D. Fla. Sept. 27, 2010) ("Because GAIC is subject to the terms and obligations of the Contract, the [School Board of Broward County, Florida's] sovereign immunity argument must fail pursuant to the principles set forth in *Pan Am*.").

7

The Supreme Court of Florida, consequently, receded from the requirement that the State of Florida expressly consent to a breach of contract lawsuit: "*We recognize that in so holding we recede from a line of cases holding that the state may not be sued in contract without express consent to the suit*." *Pan-Am Tobacco Corp.*, 471 So. 2d at 5 (emphasis added).

This seminal decision was not constrained by the Supreme Court of the United States in *Florida Department of Health & Rehabilitation Services v. Florida Nursing Home Association*. 450 U.S. 147 (1981) (per curiam). A quick review of the *Nursing Home* case reveals that it is irrelevant to the present claims against FDEM because it did not involve a breach of contract claim against Florida, but rather dealt with whether Florida waived sovereign immunity by participating in a federal program—and it was decided three years before the seminal *Pan-Am* case. *Id*. at 150. Lastly, contrary to FDEM's disingenuous representation, the Supreme Court did not condition sovereign immunity on whether the suit was brought in a federal court located in Florida or a non-Florida federal court.

Here, "FDEM does not dispute that it entered into two contracts with Essential in 2020 for the purchase of 600,000 COVID test kits for a total of $6.6 million." [Motion, sec. II, pg. 2]. Plaintiffs, moreover, have properly pleaded claims for breach of contract regarding PO#1 and PO#2 as discussed below. Because FDEM entered into two contracts with Essential, it waived sovereign immunity against Plaintiffs' breach of contract claims regarding PO#1 and PO#2. The law is clear: FDEM cannot enter into a contract, breach it, then hide behind sovereign immunity. The Court should deny the Motion pursuant to the principles set forth in *Pan-Am*.

    b. <u>FDEM suspended Florida procurement laws and accepted Essential's Terms and Conditions of Sale.</u>

FDEM's arguments, primarily, rest on the presumption that it could not have legally agreed to Essential's terms and conditions because Florida procurement law requires Florida state

8

agencies to include Florida's preferred terms and conditions in all formal solicitations. But this presumption is false.

On March 7, 2020, the Governor of Florida ordered the Director of FDEM to execute Florida's Comprehensive Emergency Management Plan and other response, recovery, and mitigation plans necessary to cope with the emergency. The Court may, and should, take judicial notice of these critical government and public documents. *See* Ex. A.[3] The Governor authorized the Director of FDEM to "[s]uspend the effect of any statute, rule, or order that would in any way prevent, hinder, or delay any mitigation, response, or recovery action necessary to cope with this emergency." *See* Ex. A, sect. 2(C).

Within a matter of days, on March 10, 2020, Jared Moskowitz—the Director of FDEM— issued an Emergency Order because Florida's COVID-19 emergency management plan was negatively impacted by the regulatory statutes governing FDEM's conduct of state business:

> Pursuant to Executive Order No. 20-52, I hereby find that the Division of Emergency Management's ("Division") timely execution of the mitigation, response, and recovery aspects of the State's emergency management plan, as it relates to COVID-19 Public Health Emergency, is negatively impacted by the application of certain regulatory statutes prescribing the procedures for the conduct of state business as well as by certain orders and rules of this agency.
>
> Pursuant to the authority granted by Section 2 of Executive Order No. 20-52, I hereby suspend the effect of any statute, rule, or order that would in any way prevent, hinder, or delay necessary action by the Division in coping with this emergency. By its express terms, this Order suspends any statute, rule, or order if: (1) strict compliance with the statute, rule, or order (as unsuspended) would in any way prevent, hinder, or delay any mitigation, response, or recovery action undertaken by the Division; and (2) such action is necessary to cope with this emergency.

*See* Ex. B."[4]

---

[3] *Shore*, 412 F. Supp. 3d at 573 (judicial notice).
[4] *Shore*, 412 F. Supp. 3d at 573 (judicial notice).

9

FDEM Order No. 20-001 suspended the effect of any statute, rule, or order that would prevent, hinder, or delay FDEM's ability to procure, *inter alia*, necessary supplies, commodities, and services to timely execute Florida's COVID-19 emergency management plan:

> Therefore, pursuant to Section 2 of Executive Order No. 20-52, I hereby issue the following authorizations:
>
> I.      Suspend any statute, rule, or order, as needed to procure any and all necessary supplies, commodities, services, temporary premises, and other resources to the extent necessary to ensure the timely performance of the Division of Emergency Management's disaster response functions as prescribed in the State Comprehensive Management Plan or as directed by the Director, the State Coordinating Officer.

*See* Ex. B.[5]  In other words, FDEM suspended its own procurement laws, statutes, rules, or purported unilateral terms and conditions.

Less than two weeks later, FDEM executed PO#1.  Specifically, Kevin Guthrie[6] on behalf of Jared Moskowitz—<u>the Director of FDEM at that time who issued FDEM Order No. 20-001</u>—executed Essential's purchase order form on or about March 22, 2020.  *See* Compl., Ex. B; *see also Stunzi v. Medlin Motors, Inc.*, 214 N.C. App. 332, 340, 714 S.E.2d 770, 777 (2011) ("In this State it is held that one who signs a paper writing is under a duty to ascertain its contents, and in the absence of a showing that he was willfully misled or misinformed . . . he is held to have signed with full knowledge and assent as to what is therein contained.").  Jared Moskowitz, the same person who signed FDEM Order No. 20-001, was heavily involved in all aspects of the contracts between Essential and FDEM.  (Emphasis added).  *See* Compl. ¶¶ 18, 33; Compl. Exs. B, C, E. By executing Essential's Purchase Order form, FDEM expressly agreed that PO#1 was subject in its entirety to the terms and conditions included in the form.  *See* Compl., Ex. B.  Further, FDEM agreed that any additional or different terms proposed "which add to, vary from, or conflict with

---

[5] *Shore*, 412 F. Supp. 3d at 573 (judicial notice).
[6] Kevin Guthrie is now the Director of FDEM.

the terms of the Agreement shall be void, and the terms of the Agreement shall govern." *See* Compl., Ex. B. sect. 1.

Within two days of PO#1, the Legislative Affairs Director of FDEM requested more test kits from Essential and Allen Kilgore and noted, "This is a priority." Compl., Ex. D. On or about March 25, 2020, FDEM agreed and accepted PO#2 based on the same terms and conditions in Essential's Purchase Order form. *See* Compl. ¶¶ 22–31; Compl., Ex. D. Because of EO No. 20-52 and FDEM Order No. 20-001, it is extremely reasonable, and legally required for a motion to dismiss, to infer that FDEM agreed to PO#2 and the same terms and conditions in Essential's Purchase Order forms, as pleaded in the Complaint. It is also incredibly reasonable to infer that FDEM did not insist on using any other terms and conditions because that would have prevented, hindered, or delayed emergency relief action that was such a "priority"—FDEM's ability to timely execute Florida's COVID-19 emergency management plan. FDEM, in short, swiftly and urgently waived any other purported terms and conditions for Essential's Purchase Order terms and conditions for an effective response to the COVID-19 pandemic.

FDEM, now, disingenuously seeks to have its cake and eat it too. But it has failed to present any grounds for dismissal within the four corners of the Complaint that show the parties amended the terms and conditions FDEM agreed to abide by when it agreed and accepted Essential's Purchase Order forms. Although FDEM's unauthenticated printout from MyFloridaMarketplace purportedly shows that Corey DeHaven of Essential registered with a website, it does not show that Essential viewed, received, or accepted the MyFloridaMarketplace "Terms and Conditions" or the PUR1000. [*See* Motion, Ex. E]. This is an important distinction and a fatal blow to FDEM's "battle of forms" argument.

On the face of the printout, it only shows that DeHaven accepted the website's "Terms of

Use," which are irrelevant to this case and <u>not</u> attached to the Motion.  [*See* Motion, Ex. E].  Such "Terms of <u>Use</u>" are unequivocally not the same thing as MyFloridaMarketplace "Terms and <u>Conditions</u>," which FDEM does attach to the Motion.  [*See* Motion, Ex. F].  The "Terms of Use" cover a vendor's use of a website and ecommerce, and nothing else.  The Terms of Use are clearly not the "Terms and Conditions" that FDEM misleadingly proffers.  FDEM is aware of this, which is likely the reason FDEM did not attach to the Motion the "Terms of Use."  Consequently, FDEM's entire "battle of forms" argument is defeated, and FDEM has failed to satisfy any grounds for dismissal based on alternative or purported terms and conditions that differ from Essential's Purchase Order forms.

As shown in the Complaint, FDEM hastily and urgently executed Essential's Purchase Order terms.  Before doing so, FDEM did not demand or require the seller to execute any other terms and conditions.  FDEM should not be rewarded for its own conduct of ignoring clearcut legislative authority, of cutting corners, and/or ignoring any of its own regulations or procedures. It has waived this argument.

Therefore, based on the factual allegations in, and the exhibits attached to, the Complaint, EO No. 20-52, and FDEM Order No. 20-001, FDEM agreed to and accepted Essential Purchase Order terms and conditions.  Certainly, the Court should, at this stage, draw the reasonable inference that FDEM swiftly agreed to Essential's terms and conditions so that, at a minimum, FDEM could urgently obtain COVID test kits that were such a high priority, and to not prevent, hinder, or delay obtaining such test kits.  The Motion should be denied.

## V. THIS COURT HAS SPECIFIC PERSONAL JURISDICTION OVER FDEM

### a. Personal Jurisdiction Standard

"Although the plaintiff must ultimately demonstrate personal jurisdiction by a

preponderance of the evidence either at trial or in a pretrial evidentiary hearing, when no evidentiary hearing is held, the plaintiff may satisfy its burden simply by making a *prima facie showing of personal jurisdiction*." *IHFC Properties, LLC v. APA Mktg., Inc.*, 850 F. Supp. 2d 604, 615 (M.D.N.C. 2012) (internal citations omitted) (emphasis added). "In assessing whether a plaintiff has made the requisite prima facie showing, a court must accept the facts alleged in the complaint as true and must draw all reasonable inferences in the plaintiff's favor." *IHFC Properties, LLC*, 850 F. Supp. 2d at 615. Even if the court considers matters outside the pleadings when assessing a motion to dismiss, the court must continue to draw all reasonable inferences in the light most favorable to the plaintiff. *IHFC Properties, LLC*, 850 F. Supp. 2d at 616; *see also UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 350 (4th Cir. 2020) ("A court must also 'construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.'").

To make a prima facie showing of personal jurisdiction, a plaintiff must show that: (1) the forum state's long-arm statute authorizes the exercise of jurisdiction; and (2) the exercise of personal jurisdiction complies with the Due Process Clause of the United States Constitution. *IHFC Properties, LLC*, 850 F. Supp. 2d at 616.

North Carolina's long-arm statute authorizes the exercise of jurisdiction over a defendant when, *inter alia*, solicitation was carried on within North Carolina by or on behalf of the defendant; or goods or other things of value were shipped from North Carolina by the plaintiff to defendant on his order. N.C. Gen. Stat. § 1-75.4(4)(a), (5)(d).

The exercise of personal jurisdiction complies with the Due Process Clause if the defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."

13

*IHFC Properties, LLC*, 850 F. Supp. 2d at 616. To determine whether specific jurisdiction exists, the court must examine: "(1) the extent to which the defendant 'purposefully avail[ed]' itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'" *IHFC Properties, LLC*, 850 F. Supp. 2d at 617; *see also Mitrano v. Hawes*, 377 F.3d 402, 407 (4th Cir. 2004) ("A defendant should be able to anticipate being sued in a court that can exercise personal jurisdiction over him.").

      b.  <u>FDEM consented to personal jurisdiction in North Carolina.</u>

"Although a contract between a North Carolina entity and an out-of-state party will not automatically establish sufficient minimum contacts for personal jurisdiction in the forum state, where a contract creates a 'substantial connection' between the out-of-state party and the forum, it can suffice to establish personal jurisdiction." *IHFC Properties, LLC*, 850 F. Supp. 2d at 618. Courts have also concluded that "where a contract is entered into in North Carolina and will be governed by North Carolina law, there is a further basis for North Carolina courts to exercise personal jurisdiction over out-of-state parties to the contract." *IHFC Properties, LLC*, 850 F. Supp. 2d 604, 618 (M.D.N.C. 2012).

"Personal jurisdiction can be waived, which means that parties to an agreement may 'contract around principles of personal jurisdiction by consenting to resolve their disputes in specified tribunals.'" *IHFC Properties, LLC*, 850 F. Supp. 2d at 618. "Forum selection clauses are presumed enforceable unless they are unreasonable under the circumstances." *IHFC Properties, LLC*, 850 F. Supp. 2d at 619 (internal quotation omitted). In *IHFC*, the court held that the forum selection clause in which the parties consented to the jurisdiction of the courts of North Carolina was more than sufficient to establish personal jurisdiction over the defendant. *Id.*

14

Here, FDEM waived a challenge to personal jurisdiction by consenting to resolve disputes in the Eastern District of North Carolina. *See* Compl. ¶¶ 7, 11. Moreover, this is strongly supported by FDEM's emergency actions, within EO No. 20-52 and FDEM Order No. 20-001, to urgently obtain COVID test kits. *See* Exs. A, B. The parties willingly agreed to the reasonable forum selection clause contained in paragraph 13 of Essential's Terms and Conditions of Sale, which were included in the purchase order forms that FDEM executed:

> All disputes with respect to this Agreement shall be brought and heard either in the North Carolina state courts located in Wake County, North Carolina, or the federal district court for the Eastern District of North Carolina located in Raleigh, North Carolina. The parties to this Agreement each consent to the in personal jurisdiction and venue of such courts.

*See* Compl., Exs. B and D, sect. 13.

This is more than sufficient, per *IHFC*, to subject the parties to jurisdiction in the federal or state courts of North Carolina. Because the forum selection clause creates a prima facie showing of personal jurisdiction over FDEM in the Eastern District of North Carolina, the Court should deny the Motion.

c. North Carolina's long-arm statute and the Due Process Clause authorize the exercise of personal jurisdiction over FDEM.

Alternatively, the exercise of personal jurisdiction over FDEM is appropriate under North Carolina's long-arm statute and the Due Process Clause. Based on the factual allegations in, and the exhibits attached to, the Complaint, EO No. 20-52, and FDEM Order 20-001, it can be reasonably inferred that FDEM solicited Essential, which was, at all relevant times, a North Carolina entity. FDEM Order 20-001 demonstrates that FDEM was focused on quickly obtaining the necessary resources to combat the COVID-19 pandemic. *See* Ex. B. Less than two weeks after the Director of FDEM suspended the statutes and rules that would have impeded timely execution of Florida's COVID-19 response plan, FDEM solicited test kits from Essential and

entered into PO#1 by signing Essential's purchase order form and agreeing to its terms and conditions. *See* Compl., Ex. B. The North Carolina long-arm statute, further, authorizes the exercise of personal jurisdiction over FDEM because the terms of the contract provided that the test kits would be shipped from Raleigh Durham, USA International Airport unless otherwise specified by Essential. *See* Compl., Ex. B, sect. 5.

Additionally, the exercise of personal jurisdiction over FDEM complies with the Due Process Clause. FDEM entered into a contract with a North Carolina entity. It is indisputable that the purchase order form FDEM executed clearly showed that Essential was a North Carolina entity with its principal place of business in Raleigh, North Carolina. *See* Compl., Ex. B. FDEM knew that payments it failed to make to Essential per the contracts would damage an account owner in North Carolina. *See* Compl. Ex. B. FDEM agreed that the agreement would be governed, construed, and enforced by the laws of North Carolina. *See* Compl., Ex. B, sect. 13. Because of these facts, it was overwhelmingly foreseeable that a breach of the purchase orders would create injury in North Carolina. Here, as pleaded, Essential was financially injured and forced to store the test kits in a storage facility in North Carolina because of FDEM's breaches. *See* Compl. ¶ 36. FDEM, in short, was able to anticipate being sued in North Carolina.

Based on the factual allegations in, and the exhibits attached to, the Complaint, EO No. 20-52, and FDEM Order 20-001, Plaintiffs have made a prima facie showing of personal jurisdiction over FDEM in North Carolina. The Court should deny the Motion.

## VI. THE EASTERN DISTRICT OF NORTH CAROLINA IS A PROPER FORUM

"The standard for deciding a motion to dismiss for lack of personal jurisdiction is the same as that for a motion to dismiss for a lack of venue." *IHFC Properties, LLC*, 850 F. Supp. 2d at 615. Under the federal venue statute:

A civil action may be brought in—

> **(1)** a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;

> **(2)** a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or

> **(3)** if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391; *see also Bullock v. Washington Metro. Area Transit Auth.*, 943 F. Supp. 2d 52, 57 (D.D.C. 2013) ("With regard to [section 1391(b)(2) ], the district in which the plaintiff brings suit need not be 'the district where the *most substantial* portion of the relevant events occurred,' but the plaintiff must 'show that a substantial *part* of the events or omissions giving rise to the claim occurred in that district.'" (emphasis in original)).

Here, venue in the Eastern District of North Carolina is appropriate because a substantial part of the events or omissions giving rise to the breach of contract claims raised in the Complaint occurred in the Eastern District of North Carolina. FDEM entered into contracts with Essential, who had its principal place of business in Raleigh, North Carolina. *See* Compl., Ex. B. The contract provided that the test kits would be shipped from Raleigh Durham, USA International Airport unless otherwise specified by Essential. *See* Compl., Ex. B, sect. 5. FDEM knew that payments it failed to make to Essential per the contract would damage an account owner in Raleigh, North Carolina. See Compl., Ex. B. FDEM, moreover, consented to suit in the federal district court for the Eastern District of North Carolina. *See* Compl., Ex. B, sect. 13. Lastly, because of FDEM's breach, Essential was forced to store the test kits in a storage facility in North Carolina. *See* Compl. ¶ 36.

Based on the factual allegations in, and the exhibits attached to, the Complaint, Plaintiffs

17

have made a prima facie showing that venue is proper in the Eastern District of North Carolina.

The Court should deny the Motion.

## VII.  THE COURT SHOULD NOT TRANSFER VENUE TO THE NORTHERN DISTRICT OF FLORIDA

"The moving party bears the burden of establishing that transfer to another venue is proper." *IHFC Properties, LLC*, 850 F. Supp. 2d at 622.  When considering whether to transfer a civil action under section 1404(a), a court should weigh the following discretionary factors:

> (1) the plaintiff's initial choice of forum; (2) relative ease of access to sources of proof; (3) availability of compulsory process for attendance of unwilling witnesses; (4) possibility of a view of the premises, if appropriate; (5) enforceability of the judgment, if one is obtained; (6) relative advantage and obstacles to a fair trial; (7) other practical problems that make a trial easy, expeditious, and inexpensive; (8) administrative difficulties of court congestion; (9) local interest in having localized controversies settled at home; (10) appropriateness of having a trial of a diversity case in a forum that is at home with the state law that must govern the action; and (11) avoidance of unnecessary problems with conflicts of laws.

*IHFC Properties, LLC*, 850 F. Supp. 2d at 622.

But, when parties agree to a forum-selection clause, the private-interest factors weigh entirely in favor of the preselected forum.  *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 64 (2013).  So, the district court should only consider arguments related to the public-interest factors.  *Atl. Marine Const. Co.*, 571 U.S. at 64.  The public-interest factors include: "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law."  *Atl. Marine Const. Co.*, 571 U.S. at 63 n.6.  "Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases."  *Atl. Marine Const. Co.*, 571 U.S. at 64.

Here, the Court should not transfer venue to the Northern District of Florida because FDEM has failed to show that transfer is proper.  FDEM's transfer analysis is based on the wrong forum

selection clause. As discussed above, based on the Complaint, EO No. 20-52, and FDEM Order 20-001, the only reasonable inference, at this stage, is that FDEM swiftly assented to the terms and conditions of Essential's Purchase Order forms, which included a forum selection clause designating this Court as the proper forum. FDEM, moreover, has failed to show that Essential viewed, received, or accepted the MyFloridaMarketplace "Terms and Conditions" or the PUR1000. Instead, FDEM proffers only that Essential accepted "Terms of Use" of a website. Collectively, the Court should infer that Essential's forum selection clause applies and examine the factors addressed below.

      a.  <u>Plaintiffs' Choice of Forum and Private Interest Factors</u>

Because plaintiff's choice of forum should rarely be disturbed, defendant must demonstrate that the balance of the factors weighs <u>strongly</u> in its favor to transfer venue. *IHFC Properties, LLC*, 850 F. Supp. 2d at 622–23; *see also Datasouth Computer Corp. v. Three Dimensional Techs., Inc.*, 719 F. Supp. 446, 451 (W.D.N.C. 1989) ("it is black letter law, that a plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request, and that choice ... should not be lightly disturbed.") (internal quotation marks omitted).

Because a plaintiff's choice of forum should not be lightly disturbed, it would have been difficult for FDEM to demonstrate that transfer was appropriate even if Plaintiffs unilaterally chose to file suit in the Eastern District of North Carolina. But that is not what happened. Plaintiffs, instead, filed suit in the Eastern District of North Carolina because the parties agreed to a forum selection clause, which provided that all disputes would be heard in either North Carolina state courts or the federal district court for the Eastern District of North Carolina located in Raleigh, North Carolina. *See* Compl., Exs. B and D, sect. 13. Thus, the private interest factors weigh entirely in favor of retaining jurisdiction in the Eastern District of North Carolina. The Court

should only consider arguments related to the following public-interest factors, which FDEM admits in the Motion. [Motion, sec. V, pg. 14].

      b.  <u>Administrative Difficulties of Court Congestion</u>

The Northern District of Florida, contrary to FDEM's counsel's bold, self-serving comment, is the most congested federal district court in the United States with 62,038 pending cases per judgeship—a number likely to increase given the number of civil filings it receives—while the Eastern District of North Carolina only has 816 pending cases per judgeship:

| U.S. District Court—Judicial Caseload Profile (2022)[7] | | |
|---|---|---|
| | <u>E.D.N.C.</u> | <u>N.D.F.L.</u> |
| Civil filings per Judgeship | 409 | 7,176 |
| Pending cases per Judgeship | 816 | 62,038 |
| Completed trials per Judgeship | 42 | 35 |
| Median time (months) from civil filing to disposition | 11.6 | 22.4 |
| Median time (months) from civil filing to trial | 36.5 | 25.8 |
| Number (and %) of civil cases over 3 years old | 354 (17.5%) | 2,415 (1%) |

The above-referenced information is readily available to FDEM and its counsel. FDEM's refusal to admit and acknowledge these facts further discredits its Motion. The administrative factor weighs heavily in favor of retaining jurisdiction in the Eastern District of North Carolina.

      c.  <u>Local Interest</u>

"Local courts have an interest in resolving localized controversies at home." *IHFC*

---

[7] *See* Administrative Office of the United States Courts, *Federal Court Management Statistics*, 2022, at 21 and 90. https://www.uscourts.gov/statistics/table/na/federal-court-management-statistics/2022/12/31-1.

*Properties, LLC*, 850 F. Supp. 2d at 624. Although this case involves litigants from Florida and Alabama, the ultimate basis for liability involves contracts governed by North Carolina law. *See* Compl., Ex. B, sect. 13. The entire lawsuit revolves around contracts with a North Carolina business. FDEM failed to pay a North Carolina business. A North Carolina business was damaged as a result. When FDEM refused delivery of the PO#2 test kits, the products were stored in a warehouse in North Carolina. Compl. ¶ 36. The local interest factor heavily favors retaining jurisdiction in the Eastern District of North Carolina.

      d.  Appropriateness of Having a Trial of a Diversity Case in a Forum that is at Home with the Governing State Law

Because the contracts are governed by North Carolina law, it would be more appropriate to have a trial in the Eastern District of North Carolina than the Northern District of Florida. This factor favors retaining jurisdiction.

      e.  Conclusion of Transfer Analysis

There is little more disserving of North Carolina's public interests than if a foreign State or business contracts with a North Carolina business and then fails to pay the North Carolina business. Based on the forum selection clause, in which the parties consented to venue in the Eastern District of North Carolina, and the public interest factors, FDEM has not carried its burden of demonstrating that the convenience to the parties and the interests of justice strongly favor transfer of this action to the Northern District of Florida. The Court should deny the Motion.

**VIII.  THE CONTRACT REGARDING PO#2 WAS VALID.**

      a.  Plaintiffs properly alleged the requisite acceptance to form a valid contract regarding PO#2.

"The essential elements of a valid, enforceable contract are offer, acceptance, and consideration." *Lewis v. Lester*, 235 N.C. App. 84, 86, 760 S.E.2d 91, 92–93 (2014). "The Federal

Rules of Civil Procedure erect a powerful presumption against rejecting pleadings for failure to state a claim." *Morgan v. City of Rawlins*, 792 F.2d 975, 978 (10th Cir. 1986). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017). "When ruling on a motion to dismiss, courts must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017). The complaint must state a claim that is plausible on its face, such that the defendant has fair notice of what the claim is and the grounds on which it rests. *Hall*, 846 F.3d at 765. Also, "a complaint is to be construed liberally so as to do substantial justice." *Id.* A complaint is sufficient to withstand a motion to dismiss if it states a claim that is plausible on its face, such that the defendant has fair notice of what the claim is and the grounds on which it rests. *Id.*

Here, a review of the Complaint and the UCC shows that Plaintiffs properly alleged offer, acceptance, and consideration regarding PO#2. FDEM admits that Plaintiffs properly alleged offer and consideration, so that is not in dispute. [*See* Motion, sect. VIII, pg. 24]. The only issue is whether or not Plaintiffs accepted PO#2. But the resolution of this issue is not appropriate, at this stage, because it involves a factual dispute that should be resolved at trial or pursuant to a motion for summary judgment once the facts are fully developed through discovery. At this stage, the focus should be on whether Plaintiffs have alleged a claim for breach of contract regarding PO#2 that is plausible on its face, such that FDEM has fair notice of what the claim is and the grounds on which it rests. Plaintiffs have met their burden.

Within two days of signing PO#1, FDEM urgently sought more COVID-19 test kits to timely execute Florida's COVID-19 emergency management plan. *See* Compl, ¶ 22. Plaintiffs

sent FDEM PO#2 dated March 23, 2020 (also Essential's Purchase Order form and Terms and Conditions). *See* Compl. ¶¶ 24–25. Although Plaintiffs have not yet discovered a signed[8] copy of this document, all parties accepted and confirmed PO#2 through emails on March 24, 2020, which are attached to the Complaint, and reflect the following:

- Allen Kilgore (Global): "I've attached the new PO for Swabs. We've verified production at the factory and can get you 400,000 Swab Kits . . . shipped out this week if we can get the PO back quickly." *See* Compl., Ex. D at 1–2.

- Jared Rosenstein (FDEM): "Per our conversation: (1) 200k order placed – this is coming along with the new order; (2) 400k order pending warrant at 50% of 4.4m – 2.2m; Please confirm Allen." *See* Compl., Ex. D at 1–2.

- Allen Kilgore (Global): "Confirmed." *See* Compl., Ex. D at 1–2.

FDEM's acceptance of PO#2 was, further, confirmed through its immediate wire of the 50% down payment—$2,200,000. *See* Compl., Exs. E and F. Notably, the PO#2 form contained the same critical terms that were signed by FDEM under PO#1 and discussed above (these terms govern; conflicting terms void; non-cancellation; complete and exclusive agreement, supersedes others). *See* Compl., Ex. D.

Despite FDEM's overall reluctance to abide by the terms and conditions it agreed to when it executed Essential's Purchase Order forms, it now seeks refuge under section 4 of Essential's Terms and Conditions of Sale. But there is none. PO#2 is not an illusory contract.

A contract for the sale of goods is governed by the UCC. *See Hensley v. Ray's Motor Co. of Forest City*, 158 N.C. App. 261, 266, 580 S.E.2d 721, 725 (2003). Under the UCC, an agreement for sale which is otherwise sufficiently definite is not invalid because it allows one party

---

[8] "The object of a signature to a contract is to show assent, but the signing of a written contract is not necessarily essential to its validity. Assent may be shown in other ways, such as acts or conduct or silence." *Burden Pallet Co. v. Ryder Truck Rental*, 49 N.C. App. 286, 289, 271 S.E.2d 96, 97 (1980).

23

to specify performance. *See* N.C. Gen. Stat. § 25-2-311(1). The default rule is that specifications or arrangements relating to shipment are at the seller's option. *See* N.C. Gen. Stat. Ann. § 25-2-311(2). Moreover, where one party's cooperation is necessary to the agreed performance of the other but is not seasonably forthcoming, the other party in addition to all other remedies may treat the failure to cooperate as a breach by failure to accept the goods. *See* N.C. Gen. Stat. § 25-2-311(3).

Here, Plaintiffs could have accepted PO#2 by either signing it or shipping the products:

> ACCEPTANCE. No order is binding on Seller unless the applicable Purchase Order is signed by Seller or Seller accepts the order by shipping the Products.

*See* Compl., Ex. D, sect. 4.

Plaintiffs pleaded that they accepted FDEM's order by shipment because all 400,000 test kits for PO#2 were shipped to the United States and were ready to be delivered to FDEM in Tallahassee:

> Immediately after the 50% payment, Essential, Mr. Kilgore, Global, and AI First, invested significant time, efforts, and costs to procure the COVID test kits under PO#2. To secure the test kits for PO#2, Essential and its agents were required to pay costs up front. On or about April 16 and 17, 2020, the first 200,000 of 400,000 test kits for PO#2 were being prepared and loaded on a plane for shipment to the United States. Within a few days, the remaining 200,000 of 400,000 test kits for PO#2 were being prepared and loaded on a plane for shipment to the United States. All test kits arrived in the United States and were ready to be delivered to FDEM in Tallahassee, Florida.

*See* Compl. ¶ 31. This paragraph should be read liberally in favor of Plaintiffs so as to do substantial justice.

FDEM's refusal, in sum, to accept the test kits does not nullify Plaintiffs' acceptance but rather exposes FDEM to liability for breach of contract for failing to accept the goods that the parties contracted for and Plaintiffs exhausted time, money, and efforts to procure. Because

24

Plaintiffs properly pleaded the existence of a valid contract with FDEM regarding PO#2, the Court should deny the Motion.

**IX.    THE ASSIGNMENT.**

FDEM willingly decided to deal directly with Essential, Global, Kilgore, and/or AI First, collectively, to procure and secure the pertinent transactions.  FDEM's Motion even admits, for example, that there was "a clear indication that Kilgore … was negotiating on behalf of Essential …" [Motion, sec. IX, pg. 26].  FDEM's willingness to collectively work with Essential, Global, Kilgore, and/or AI First to urgently obtain COVID test kits, is indisputable.

To even reach FDEM's argument regarding anti-assignment of claims, this Court would need to first find or, at minimum, infer that FDEM's unilaterally attempted, self-imposed alternative terms and conditions apply in this case.  First, Plaintiffs have clearly shown above that this is not true because FDEM waived and suspended any such alternative terms.  Second, this is both premature and contrary to legal standards at the dismissal stage.  As shown above, the factual allegations in, and the exhibits attached to, the Complaint, EO No. 20-52, and FDEM Order No. 20-001 reflect and infer the exact opposite—FDEM accepted and agreed to Essential's Purchase Order form and Terms and Conditions.

"[A]n action arising out of contract may be assigned." *Atl. Coast Mech., Inc. v. Arcadis, Geraghty & Miller of N. Carolina., Inc.*, 175 N.C. App. 339, 343, 623 S.E.2d 334, 338 (2006); *see also Brakebush Bros., Inc. v. Certain Underwriters at Lloyd's of London - Novae 2007 Syndicate*, No. 20 CVS 367, 2021 WL 5099697, at \*5 (N.C. Super. Nov. 1, 2021), *reconsideration denied*, No. 20 CVS 367, 2022 WL 1511788 (N.C. Super. May 11, 2022) ("[t]he right to receive money due or to become due under an existing contract may be assigned. An assignee of a contractual right is a real party in interest and may maintain the action."); *see, e.g.*, *First-Citizens*

*Bank & Tr. Co. v. Universal Underwriters Ins. Co.*, 113 N.C. App. 792, 796–97, 440 S.E.2d 304, 307 (1994) (Contracts prohibiting assignments apply to assignments before loss, and do not prevent an assignment after loss; the assignment before loss involves a transfer of a contractual relationship while the assignment after loss is the transfer of a right to a money claim).

Early in the Complaint (¶ 8), Global states that, at all relevant times, it is and was an agent of Essential for the pertinent transactions. There is a clear legal distinction between being an agent for Essential versus being an assignee of contractual obligations within the contracts. An "assignee" is "someone to whom property rights or powers are transferred by another." ASSIGNEE, Black's Law Dictionary (11th ed. 2019). An "agent" is "someone who is authorized to act for or in place of another; a representative." AGENT, Black's Law Dictionary (11th ed. 2019). FDEM mistakenly asserts that Global being an "agent" for Essential means that Global was an "assignee" of obligations within the contracts.

Additionally, the Complaint confirms that Essential has assigned all <u>legal causes of action</u> in this matter to Global. *See* Compl. ¶ 8. These allegations are supported by evidence within the Complaint, including the parties' emails and the legally binding Assignment. *See* Compl., Ex. A. Thus, FDEM is apprised and well-aware that Global has authority to assert all claims on behalf of Essential. FDEM apparently confuses (1) an assignment of legal claims <u>after</u> a violation has occurred with, (2) an assignment of duties and obligations <u>during</u> the contracts themselves. FDEM's attempt to avoid claims, avoid a lawsuit, or avoid keeping its promises based on the Assignment is unfounded and misplaced. The Court should deny the Motion.

## X. ALTERNATIVELY PLEADED CAUSES OF ACTION.

### a. Global properly pleaded alternative claims.

In the unlikely event (as discussed above) that the Court ultimately determines that

FDEM's purported unilateral "terms and conditions" apply to PO#2, and in an abundance of caution, Global asserted a breach of contract claim in the alternative to Essential's Purchase Order form terms and conditions. This is perfectly acceptable under the rules of pleading. *See TSC Rsch., LLC v. Bayer Chemicals Corp.*, 552 F. Supp. 2d 534, 540 (M.D.N.C. 2008) ("[U]nder Rule 8(e)(2), a party may plead alternatively or hypothetically within a single count or defense, or assert separate claims or defenses in an alternative or multiple manner.").

Prior to this lawsuit, FDEM has taken inconsistent positions regarding the purported "terms and conditions" which it believes applies to PO#2. Therefore, in anticipation, in Count V of the Complaint, Global (in the shoes of Essential) asserts an alternative breach of PO#2 under the terms and conditions that FDEM is disingenuously proffering. Global has pleaded an offer, acceptance, consideration, and breach. Under the terms and conditions that FDEM proffers (Motion, Ex. F), even if FDEM attempted to cancel PO#2 for "convenience," which FDEM has claimed, FDEM was obligated to pay Essential for "that work satisfactorily performed for which costs can be substantiated." Global has properly pleaded that FDEM breached the contract by failing to pay these costs. Compl. ¶¶ 81–82.

FDEM is aware of the pre-suit positions it has taken. FDEM is aware of discovery documents showing that it attempted to terminate PO#2 for "convenience." Despite this, FDEM again attempts to avoid all contractual liability for its conduct, even under its own self-serving terms and conditions. However, FDEM has failed to satisfy any grounds for dismissal of the alternative Count V cause of action, for all the same reasons discussed throughout this Response. Finally, any alternative causes of action should in no way disturb the well-pleaded claims and allegations of Counts I and II.

      b.  <u>Plaintiffs, Kilgore and AI First.</u>

Prior to the pending lawsuit, FDEM is well-aware that it asserted a position that, if there was a contract for PO#2, the contract may have been between FDEM and Kilgore or FDEM and AI First. Now, for the first time, "FDEM does not dispute that it entered into two contracts with Essential in 2020 for the purchase of 600,000 COVID test kits for a total of $6.6 million." [Motion, sec. II, pg. 2]. However, it also states such "For the purposes of this motion," seemingly allowing itself to contradict such position later.

As a result, Kilgore and AI First asserted alternative breach of contract claims in Counts III, IV, VI, and VII. But, if or when FDEM finally answers the Complaint and admits that it contracted with Essential in PO#1 and PO#2 (as purported in the Motion), or if this Court determines that FDEM's Motion indisputably admits now that FDEM contracted with Essential in PO#1 and PO#2, Plaintiffs will voluntarily dismiss Kilgore and AI First without prejudice from this lawsuit. Otherwise, Kilgore and AI First have properly pleaded alternative breaches of contract, and the Motion should be denied.

<u>CONCLUSION</u>

In summary, FDEM's Motion asserts several arguments that are not even plausibly accurate or well-founded. FDEM misrepresents that it did not have legal or legislative authority to execute PO#1 and PO#2 and, thus, its own self-serving, unilateral terms and conditions must apply. FDEM misrepresents that it did not avail itself, or consent, to jurisdiction and venue in North Carolina. FDEM misrepresents the public interest factors for convenience of the parties and interests of justice.

The Complaint includes all the necessary parties, elements, and requirements for its properly pleaded causes of action. Plaintiffs have provided adequate notice of the nature and extent of their claims. For purposes of dismissal, the Court must take these allegations as true and draw

28

every reasonable inference in Plaintiffs' favor. The Court may not go beyond the four corners of the Complaint in considering the legal sufficiency of the allegations and is precluded from considering FDEM's arguments that extend beyond the pleading.

It is quite perplexing how or why the "state agency responsible for responding to both natural and manmade disasters in Florida" (Motion, p. 1) refuses to keep its promises to those parties that swiftly jumped in and helped battle a global pandemic (especially when the state agency received federal relief funds for this exact purpose and possessed clear legislative authority). It is more disturbing that the state agency now seeks to dismiss and prevent those cooperating parties from their entitled compensation and their rightful day in court.

FDEM's Motion is nothing but a prayer for improper inferences or legal conclusions in its own favor. Contrary to well-established dismissal standards, the Motion soars beyond the four corners of the pleading. For all the above-noted reasons in this Response, FDEM's Motion should be denied in its entirety.

WHEREFORE, Plaintiffs, Global Innovative Concepts, LLC; A.I. First Alabama, LLC; and Allen Kilgore, respectfully request that this Court deny the Motion.

Respectfully submitted this the 30th day of March, 2023.

/s/ Joel R. Rhine
Joel R. Rhine
Martin A. Ramey
Ruth A. Sheehan
RHINE LAW FIRM, P.C.
1612 Military Cutoff Road, Suite 300,
Wilmington, NC 28403
Telephone: (910) 772-9960
Facsimile: (910) 772-9062
Phone: (910) 772-9960
jrr@rhinelawfirm.com
mjr@rhinelawfirm.com
ras@rhinelawfirm.com

29

Thomas S. Cargill
Morgan & Morgan, P.A.
Business Trial Group
20 N. Orange Ave, Suite 1600
Orlando, FL 32801
Telephone: (407) 245-3518
tcargill@forthepeople.com
vwhitaker@forthepeople.com