IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:23-CV-69-FL

| | |
|---|---|
| GLOBAL INNOVATIVE CONCEPTS, LLC; A.I. FIRST ALABAMA, LCC; and ALLEN KILGORE, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| STATE OF FLORIDA, DIVISION OF EMERGENCY MANAGEMENT, | ) ) ) |
| Defendant. | ) |

ORDER

This matter is before the court on defendant's motion to dismiss or, in the alternative, to transfer pursuant to Federal Rules of Civil Procedure 12(b)(2), (3), and (6) (DE 13). The motion has been briefed fully and in this posture is ripe for ruling. For the reasons that follow, defendant's motion is denied.

**STATEMENT OF THE CASE**

Plaintiffs commenced this action February 15, 2023, with claims arising out of two transactions in 2020 between Essential Diagnostics, LLC ("Essential"), a North Carolina business, and defendant State of Florida, Division of Emergency Management ("FDEM") for the purchase of 600,000 COVID test kits. Plaintiffs provide in their complaint that Essential assigned its legal claims against defendant to plaintiffs, two Alabama corporations and a resident of Alabama. Plaintiffs seek damages, costs, and interest.

Defendant filed the instant motion to dismiss or, in the alternative, to transfer March 9, 2023, with reliance upon plaintiff Global Innovative Concepts, LLC's ("Global") complaint in Florida state court asserting claims premised upon the same conduct by defendant; the state court's order of dismissal, permitting plaintiff time to file amended complaint; and plaintiff Global's subsequent notice of voluntary dismissal. Defendant also includes as exhibits the State of Florida's purchase order form, which defendant contends contains additional terms and conditions to which Essential assented; a printout from MyFloridaMarketplace, an online portal that serves as the state's eProcurement system connecting state agencies with vendors, indicating an employee of Essential registered with MyFloridaMarketplace on March 25, 2020; and the MyFloridaMarketplace terms and conditions.

Plaintiffs responded in opposition, relying upon the governor of Florida's Executive Order No. 20-52 and FDEM's responsive Emergency Order.

Scheduling conference activities are stayed pending decision on the instant motion.

## STATEMENT OF FACTS

The facts alleged in plaintiffs' complaint may be summarized as follows. On March 22, 2020, defendant entered into an agreement with Essential for the purchase of 200,000 COVID viral sample collection kits for $2,200,000.00. (Compl. ¶ 10). That agreement was recorded in a purchase form, executed by Kevin Guthrie on behalf of Jared Moskowitz, director of FDEM (hereinafter, "first purchase order"). (Id.).

The first purchase order includes a clause providing that the agreement "shall be governed by and construed and enforced in accordance with the laws of the State of North Carolina" and "[a]ll disputes with respect to [it] shall be brought and heard either in the North Carolina state courts located in Wake County, North Carolina, or the federal district court for the Eastern District

of North Carolina[.]" (Id. ¶ 11). It also provides that the "Terms and Conditions of Sale and the Purchase Agreement . . . govern the sale of all Seller's products [] to Buyer" and "[a]ny terms proposed by Buyer, which add to, vary from, or conflict with the terms of the Agreement shall be void, and the terms of the Agreement shall govern." (Id. ¶ 12). Finally, it states:

> This Agreement and any acknowledgement or acceptance of a purchase order by Seller constitute the complete and exclusive statement of the agreement between the parties regarding the subject matter hereof and supersede all proposals, oral or written, and all other communications between the parties relating to the subject matter herein.

(Id. ¶ 14).

Defendants Global, A.I. First Alabama ("AI First"), and Alan Kilgore ("Kilgore"), a principal and officer of both Global and AI First, were agents of Essential. (Id. ¶ 23). Essential, Global, and Kilgore "invested significant time, efforts, and costs to procure the COVID test kits" under the first purchase order, and on April 3, 2020, Essential delivered the 200,000 COVID test kits to FDEM in Tallahassee, Tennessee. (Id. ¶¶ 16-17). Defendant confirmed by email receipt of the tests and that the tests had been "vetted and cleared" by Florida State University Laboratories and by "FLDOH." (Id. ¶ 18). Pursuant to the terms of the signed purchase form, defendant was obligated to pay the total purchase amount of $2,200,000.00 for the first purchase order within 45 days of delivery, or by May 18, 2020. (Id. ¶ 19). Defendant has not made a payment under the first purchase order. (Id.).

On March 24, 2020, two days after signing the first purchase order, defendant contacted Kilgore and requested additional COVID test kits from Essential. (Id. ¶ 22). Kilgore, on behalf of Essential, offered to provide an additional 400,000 test kits for $4,400,000.00. (Id. ¶ 24). Kilgore sent defendant a purchase order with terms identical to those identified in the first purchase order, but with the additional requirement that defendant pay half the total invoice up front with

3

the remainder due within 45 days of delivery (hereinafter, "second purchase agreement"). (Id. ¶¶ 25, 30). Defendant responded by email expressing interest in "swabs" and thereafter with a signed letter on FDEM letterhead confirming payment of $2,200,000.00 for the purchase of 400,000 testing kits, and providing that the balance of $2,200,000.00 would be paid within 45 days of receipt of the kits. (Exhibit D (DE 1-4); Exhibit E (DE 1-5)).

Plaintiffs again "invested significant time, efforts, and costs to procure the COVID tests" under the second purchase agreement, and by April all 400,000 test kits were ready to be delivered to defendant in Tallahassee, Florida. (Compl. ¶ 31). Approximately April 16, 2020, however, defendant "attempted to terminate [the second purchase agreement] based upon [defendant's] purported convenience." (Id. ¶ 32). Defendant also thereafter alleged that the test kits delivered under the first purchase agreement were defective, despite earlier confirming that they had been vetted and cleared by Florida State University Laboratories and by "FLDOH." (Id.). The director of legal affairs of FDEM also had previously communicated with plaintiffs that he had verified other states were successfully using the same test kits. (Id. ¶ 33). Several labs in Florida likewise were using them. (Id.).

Plaintiffs sought a discussion with defendant to alleviate concerns and provided defendant with confirmation of the successful use of the test kits in Florida. (Id. ¶ 34). Defendant responded that it would provide documentation to support its claims of product deficiencies, but never did. (Id. ¶ 35). Defendant also did not pursue remedies under the product warranties. (Id.).

Defendant ultimately refused to accept delivery of the 400,000 test kits under the second purchase agreement. (Id. ¶ 36). Defendant also declined to pay the remaining $2,200,000.00 owed under it. (Id.). Plaintiffs maintained availability of the test kits in a storage facility in North Carolina. (Id.).

4

# COURT'S DISCUSSION

A.   Standard of Review

Federal Rule of Civil Procedure 12(b)(2) allows for dismissal of a claim for lack of personal jurisdiction. "When a district court considers a question of personal jurisdiction based on the contents of a complaint and supporting affidavits, the plaintiff has the burden of making a prima facie showing in support of its assertion of jurisdiction." Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558 (4th Cir. 2014).[1]  At this stage, the court "must construe all relevant pleading allegations in the light most favorable to plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Combs v. Bakker, 886 F.2d 673, 676 (4th Cir.1989); see Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir.1993) ("[T]he district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor.").

"To survive a motion to dismiss for improper venue when no evidentiary hearing is held, the plaintiff need only make a prima facie showing of venue." Mitrano v. Hawes, 377 F.3d 402, 405 (4th Cir. 2004). "[A] district court is required to weigh the factors involved and "[u]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." Collins v. Straight, Inc., 748 F.2d 916, 921 (4th Cir. 1984).

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.  In evaluating whether a claim is stated, "[the] court accepts all well-

---

[1]   Internal citations and quotation marks are omitted from all citations unless otherwise specified.

pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

B. Analysis

1. Personal Jurisdiction

Defendant contends the court lacks personal jurisdiction over it.

The United States Court of Appeals for the Fourth Circuit has described the requirements for personal jurisdiction as follows:

> To demonstrate personal jurisdiction over a defendant consistent with the Due Process Clause, a plaintiff must show (1) a State's general jurisdiction over the defendant by demonstrating the defendant's continuous and systematic contact with the State; (2) a State's specific jurisdiction over the defendant by demonstrating that the defendant purposely established minimum contacts in the forum state such that it should reasonably anticipate being haled into court there on a claim arising out of those contacts; or (3) Rule 4(k)(2) jurisdiction by demonstrating that no State can exercise personal jurisdiction over the defendant and that the defendant has sufficient contacts with the United States such that exercising jurisdiction over the defendant would be consistent with the U.S. Constitution and laws.

Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd., 911 F.3d 198 (4th Cir. 2018) (emphasis in original). Plaintiff here asserts it has demonstrated specific jurisdiction. See id.

"A lawful assertion of personal jurisdiction over a defendant requires satisfying the standards of the forum state's long-arm statute and respecting the safeguards enshrined in the Fourteenth Amendment's Due Process Clause." Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., 682 F.3d 292, 301 (4th Cir. 2012). Where "North Carolina's long-arm statute is construed to extend jurisdiction over nonresident defendants to the full extent permitted by the Due Process Clause, . . . the dual jurisdictional requirements collapse into a single inquiry" of whether personal jurisdiction comports with due process. Christian Sci. Bd. of Directors of

First Church of Christ, Scientist v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001); see Universal Leather, LLC v. Koro AR, S.A., 773 F.3d 553, 558–59 (4th Cir. 2014) (same).

"For a [s]tate to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State." Walden v. Fiore, 571 U.S. 277, 284 (2014). "To decide whether specific jurisdiction exists, we examine (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the [s]tate; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." Mitrano, 377 F.3d at 407; see Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-76 (1985). With regard to the first prong, the touchstone of the purposeful availment inquiry is whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

Here, defendant entered into a contractual agreement with a North Carolina business, the alleged breach of which forms the basis of the instant action. The Supreme Court of the United States has emphasized:

> that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

Burger King Corp., 471 U.S. at 479.

Considering those factors and drawing inferences favorable for the existence of jurisdiction, as the court must at this stage, defendant in its first order of COVID-19 tests signed an agreement expressly providing that it "shall be governed by and construed and enforced in accordance with the laws of the State of North Carolina." (Compl. ¶ 11); see Consulting Engineers

7

Corp. v. Geometric Ltd., 561 F.3d 273, 281 (4th Cir. 2009) ("The inclusion of a choice of law clause is one factor that a court may take into account in determining whether the exercise of personal jurisdiction is justified[.]"). The agreement also provides that "[a]ll disputes with respect to [it] shall be brought and heard either in the North Carolina state courts located in Wake County, North Carolina, or the federal district court for the Eastern District of North Carolina[.]" (Compl. ¶ 11 (emphasis added)); see Nat'l Equip. Rental, Ltd. v. Szukhent, 375 U.S. 311, 315–16 (1964) ("[I]t is settled . . . that parties to a contract may agree in advance to submit to the jurisdiction of a given court."); Consulting Engineers Corp., 561 F.3d at 281 n.11 ("[A] valid forum selection clause . . . may act as a waiver to objections to personal jurisdiction." (emphasis in original)).

Assuming plaintiffs' credibility and construing their pleading allegations in the light most favorable to them, defendant was bound by those same terms with respect to its second order of COVID-19 test kits. The first agreement provided that the "Terms and Conditions of Sale and the Purchase Agreement govern the sale of all Seller's products [] to Buyer." (Compl. ¶ 12). Moreover, days after defendant placed its first order, defendant sought additional COVID-19 test kits from Essential. (Compl. ¶ 22). Kilgore sent defendant a purchase order with identical choice of law and forum selection clauses, and defendant responded with a signed letter on FDEM letterhead confirming payment of $2,200,000.00 for the purchase of 400,000 testing kits, with the balance of $2,200,000.00 to be paid within 45 days of receipt of the kits, consistent with the purchase order's terms.[2] (Id. ¶¶ 24-25; (Exhibit D (DE 1-4); Exhibit E (DE 1-5))).

Finally, where defendant was dealing with a North Carolina company, it also was foreseeable that the harm would be felt in North Carolina. Carefirst of Maryland, Inc. v. Carefirst

---

[2] On this basis, and with respect to the instant motions where inferences are to be drawn in plaintiffs' favor, the court infers that defendant's orders were governed by Essential's terms included in the first and second purchase agreement, including the forum selection and choice of law clauses.

8

Pregnancy Centers, Inc., 334 F.3d 390, 401 (4th Cir. 2003) ("[T]he place that the plaintiff feels the alleged injury is plainly relevant to the [jurisdictional] inquiry[.]"). Indeed, plaintiffs allege after defendant refused to accept delivery of the 400,000 test kits under the second purchase agreement, the test kits were kept in a storage facility in North Carolina. (Compl. ¶ 36).

In sum, on the facts alleged, defendant "purposefully derive[d] benefit" in the form of COVID test kits from North Carolina, and it would be "unfair to allow [defendant] to escape having to account in [North Carolina] for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed." Burger King Corp., 471 U.S. at 473-74. Defendant's counterargument—that MyFloridaMarketPlace terms and conditions in fact apply based upon later conduct by plaintiffs—requires resolution of factual issues in dispute and thus is of no avail at this stage in the litigation.

Plaintiffs have made a prima facie showing of personal jurisdiction.

2. Venue

Defendant contends the court should dismiss this action because the Eastern District of North Carolina is not a proper forum. Alternatively, defendant seeks for the court to transfer the case to the Northern District of Florida. The court considers each argument in turn.

a. Improper Venue

Rule 12(b)(3) allows for dismissal for "improper venue," Fed. R. Civ. P. 12(b)(3), and pursuant to section 1406(a) "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). Together, these provisions "authorize dismissal only when venue is 'wrong' or 'improper' in the forum in

which it was brought." Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas, 571 U.S. 49, 55 (2013).

"This question—whether venue is 'wrong' or 'improper'—is generally governed by 28 U.S.C. § 1391," id., which states that "[e]xcept as otherwise provided by law . . . this section shall govern the venue of all civil actions brought in district courts of the United States," § 1391(a)(1). The governing provisions provide that:

> [a] civil action may be brought in—(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). "When venue is challenged, the court must determine whether the case falls within one of the three categories set out in § 1391(b)." Atl. Marine Const., 571 U.S. at 56. "If it does, venue is proper; if it does not, venue is improper, and the case must be dismissed or transferred under § 1406(a)." Id.

With respect to the second category, "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred," 28 U.S.C. § 1391(b), "court should not focus only on those matters that are in dispute or that directly led to the filing of the action," Mitrano, 377 F.3d at 405. "Rather, it should review the entire sequence of events underlying the claim," bearing in mind that "it is possible for venue to be proper in more than one judicial district." Id.

Applying those principles here, plaintiffs allege that Essential, while located in Raleigh, North Carolina, invested substantial time and efforts to procure the COVID tests and ship them to Florida in satisfaction the first and second purchase agreement. (Compl. ¶¶ 16-17, 31; see Exhibit

B (DE 1-2) at 2 (listing Essential's address)); see Mitrano, 377 F.3d at 405-06 (concluding the plaintiff's legal work completed in the district "constituted 'a substantial part of the events [and] omissions giving rise to [the plaintiff's] claim' for breach" of the parties' contract for plaintiff's legal counsel). Plaintiffs thus plead Essential's work under the contracts in question, completed in the Eastern District of North Carolina, forms a substantial part of what entitles plaintiff to payment sought under the contract.

Plaintiff has made a prima facie showing of proper venue.

### b. Transfer Venue

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). "Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988); see Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas, 571 U.S. 49, 60 (2013) ("Section 1404(a) is merely a codification of the doctrine of forum non conveniens for the subset of cases in which the transferee forum is within the federal court system; in such cases, Congress has replaced the traditional remedy of outright dismissal with transfer."). Defendant on this basis seeks transfer to the Northern District of Florida.

"[T]here is ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum." Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 (1981); see Stewart Org., 487 U.S. at 30-31; Trustees of the Plumbers & Pipefitters Nat. Pension Fund v. Plumbing Servs., Inc., 791 F.3d 436, 444 (4th Cir. 2015).

Private interest factors include "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive." Atl. Marine Const., 571 U.S. at 63 n.6. Public interest factors include "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." Id. Where the parties agree to a forum-selection clause, "the private-interest factors weigh entirely in favor of the preselected forum." Id. at 64 ("When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation."). The court accordingly should consider only arguments related to the public interest factors. Id. "Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." Id.

Based on the facts alleged, as heretofore explained, (see supra fn.2), with respect to both purchases the court infers that a forum selection clause designating this court governed.

Turning, then, to the public interest factors, "the administrative difficulties flowing from court congestion" does not clearly favor either court. Atl. Marine Const., 571 U.S. at 64. The same is true with respect to "the local interest in having localized controversies decided at home"— though Florida certainly has an interest in deciding the case as it concerns COVID tests ordered by a Florida agency to be used in Florida, North Carolina has an interest in remedying harm done to a North Carolina business with respect to a contract that, based on the facts alleged, is governed in part by North Carolina law. Id. Finally, "the interest in having the trial of a diversity case in a forum that is at home with the law" again does not clearly favor either forum. Id. On the facts

alleged, counts I through IV are governed by North Carolina law, while counts V through VII are governed by Florida law. As defendant contends, Florida courts are more familiar with the Florida state government and its agencies, and thus the Northern District of Florida may have localized knowledge that will assist in the resolution of this case. Though that hypothetical possibility may weigh in favor of the Northern District of Florida, it alone is insufficient to alter the scales such that transfer is proper.

In sum, where at this stage the private interest factors weigh entirely in favor of this district, and where the public interest factors do not clearly favor either venue, transfer is improper.

3. Sovereign Immunity

Defendant contends it is entitled to sovereign immunity as it is an agency of the state.

"[T]he principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98 (1984) ("[F]ederal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States."). As a limitation on the grant of judicial authority in Art. III, sovereign immunity "demands a withdrawal of jurisdiction" that effectively confers on states an immunity from suit in federal courts by private parties absent consent given. Suarez Corp. Indus. v. McGraw, 125 F.3d 222, 227 (4th Cir. 1997); see Employees of Dep't of Pub. Health & Welfare, Missouri v. Dep't of Pub. Health & Welfare, Missouri, 411 U.S. 279, 280 (1973). Sovereign immunity extends to state agencies and officials properly considered "an arm of the state." Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977).

State sovereign immunity may be abrogated in two limited circumstances: 1) a state may unequivocally express its consent to be sued in federal court, or 2) with an unequivocal expression

13

of intent, Congress may abrogate sovereign immunity with a valid exercise of its powers. Seminole Tribe of Fla. v. Fla., 517 U.S. 44, 55 (1996); Fitzpatrick v. Bitzer, 427 U.S. 445, 457 (1976); Edelman v. Jordan, 415 U.S. 651, 673 (1974); Passaro v. Virginia, 935 F.3d 243, 247 (4th Cir. 2019). The first circumstance here is relevant.

"In Florida, sovereign immunity is the rule, rather than the exception[.]" Pan-Am Tobacco Corp. v. Dep't of Corr., 471 So. 2d 4, 5 (Fla. 1984). The Florida "legislature has explicitly waived sovereign immunity in tort." Id. There is, however, "no analogous waiver in contract." Id. The Supreme Court of Florida nonetheless has held "where the state has entered into a contract fairly authorized by the powers granted by general law, the defense of sovereign immunity will not protect the state from action arising from the state's breach of that contract." Id. (reasoning that otherwise contracts with state agencies would be "illusory").

Plaintiffs allege defendant entered into two purchase agreements for procurement of COVID tests, and under Pan-Am Tobacco sovereign immunity cannot protect defendant from this action alleging breach of those agreements. Defendant in opposition contends that a contract under the terms of the first and second purchase agreements was not legislatively authorized, as Florida procurement law requires its state agencies to include Florida's preferred terms and conditions in all formal solicitations. (See MyFloridaMarketplace Terms and Conditions (DE 14-7)).

Plaintiffs, however, make a part of their response in opposition[3] the governor of Florida's Executive Order No. 20-52 instructing the director of FDEM to execute Florida's Comprehensive Emergency Management Plan to cope with the COVID-19 pandemic, and FDEM's ensuing

---

[3] Given the "jurisdictional nature" of sovereign immunity, Suarez, 125 F.3d at 227, the court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment," Velasco v. Gov't of Indonesia, 370 F.3d 392, 398 (4th Cir.2004). Cf. Zak v. Chelsea Therapeutics Int'l, Ltd., 780 F.3d 597, 607 (4th Cir. 2015) ("[C]ourts are permitted to consider facts and documents subject to judicial notice without converting the motion to dismiss into one for summary judgment."); Fed. R. Evid. 201.

Emergency Order suspending the effect of any statute, rule, or order that would prevent, hinder, or delay FDEM's ability to procure necessary supplies, commodities, and services to timely execute Florida's COVID-19 Emergency Management Plan. (Exhibit A (DE 17-1); Exhibit B (DE 17-2)). It follows from these orders that defendant suspended its procurement laws to the extent they hindered or delayed defendant in procuring supplies to execute the state's COVID-19 Emergency Management Plan. Construing these facts in the light most favorable to plaintiffs, it is reasonable to infer that defendant agreed to the terms of the purchase agreements and did not insist on using Florida's preferred terms and conditions because such insistence would have prevented, hindered, or delayed its procurement of COVID-19 tests and, more generally, its execution of Florida's COVID-19 emergency management plan, as was permitted under the governing emergency orders.

In sum, based on the facts alleged and plaintiffs' exhibits, defendant entered into two purchase agreements governed by Essential's terms and conditions, and cannot avail itself of qualified immunity to protect against this suit arising out of alleged breach of those agreements.

    4.     Failure to State a Claim

        a.     Whether the Second Contract was Illusory

"In the formation of a contract an offer and an acceptance are essential elements." Snyder v. Freeman, 300 N.C. 204, 218 (1980). Defendant contends the second agreement was illusory as plaintiffs' fail to allege their acceptance. Specifically, paragraph four of Essential's terms and conditions provides:

> ACCEPTANCE. No order is binding on Seller unless the applicable Purchase Order is signed by Seller or Seller accepts the order by shipping the Products. Seller may at any time, without notice, change or suspend credit terms, stop shipment or cancel unfilled purchase orders . . .

(Exhibit D (DE 1-4) at 8); see N.C. Gen. Stat. § 25-2-311(1) ("An agreement for sale which is otherwise sufficiently definite (subsection (3) of G.S. 25-2-204) to be a contract is not made invalid by the fact that it leaves particulars of performance to be specified by one of the parties."). According to defendant, plaintiffs neither allege that Essential signed the second purchase agreement nor that the COVID test kits were shipped.

Upon review of the complaint, plaintiffs do not plead that Essential signed the second purchase agreement. With respect to shipment, plaintiffs plead that after receiving defendant's deposit:

> Essential, Mr. Kilgore, Global, and AI First, invested significant time, efforts, and costs to procure the COVID test kits under PO#2. To secure the test kits for PO#2, Essential and its agents were required to pay costs up front. On or about April 16 and 17, 2020, the first 200,000 of 400,000 test kits for PO#2 were being prepared and loaded on a plane for shipment to the United States. Within a few days, the remaining 200,000 of 400,000 test kits for PO#2 were being prepared and loaded on a plane for shipment to the United States. <u>All test kits arrived in the United States and were ready to be delivered to FDEM in Tallahassee, Florida</u>.

(Compl. ¶ 31 (emphasis added)). Plaintiffs additionally allege that defendant ultimately "refused to accept delivery of the 400,000 test kits" under the second purchase agreement. (Id. ¶ 36). Upon defendant's refusal, "Essential and its agents maintained availability of the test kits in a storage facility in North Carolina." (Id.).

Thus, contrary to defendant's arguments in opposition, plaintiffs have pleaded that they accepted defendant's order by shipment. See N.C. Gen. Stat. § 25-2-311(3)(b) ("[W]here one party's cooperation is necessary to the agreed performance of the other but is not seasonably forthcoming, the other party in addition to all other remedies . . . [may] treat the failure . . . to cooperate as a breach by failure to . . . accept the goods."). Accordingly, defendant's motion to dismiss on the basis of an illusory contract is denied.

   b.  Assignments of Rights

Defendant contends that under the My Florida Marketplace standard terms and conditions Essential was not permitted to subcontract work without defendant's written consent and was prohibited from assigning its duties and obligations under the contract. (MyFloridaMarketplace Terms and Conditions (DE 14-7)). Pursuant to the foregoing analysis, however, plaintiffs' factual allegations and exhibits reflect that defendant accepted and agreed to Essential's first and second purchase agreement, which does not include an anti-assignment provision, and which invokes North Carolina law. Under North Carolina law, "an action arising out of contract may be assigned." Atl. Coast Mech., Inc. v. Arcadis, Geraghty & Miller of N. Carolina., Inc., 175 N.C. App. 339, 343 (2006) (citing N.C. Gen. Stat. § 1-57).

Thus, defendant's motion to dismiss on this basis is denied.

  c.  Alternatively Pleaded Causes of Action

Finally, defendant contends that plaintiffs' claims in counts III, IV, VI, and VII are internally contradictory. Plaintiffs' claims are as follows:

> Counts I and II: defendant breached its first and second contract with Essential, asserted by Global, an assignee of Essential, under Essential's terms and conditions;
>
> Count III: in the alternative to count II, if the second contract was with AI First rather than Essential, defendant committed breach against AI First. AI First asserts this claim under the terms and conditions of the second purchase agreement;
>
> Count IV: in the alternative to counts II and III, if defendant's second contract was with Kilgore rather than Essential or AI First, defendant committed breach against Kilgore. Kilgore asserts this claim under the terms and conditions of the second purchase agreement;
>
> Count V: in the alternative to counts II, III, and IV, if the second contract was with Essential, and is governed by the My Florida Marketplace standard terms and conditions, Global, as Essential's assignee, contends defendant breached My Florida Marketplace's terms and conditions;
>
> Count VI: in the alternative to counts II, III, IV, and V, if the second contract was with AI First, and is governed by the My Florida Marketplace standard terms and conditions, AI First contends defendant breached My Florida Marketplace's terms and conditions;

> Count VII: in the alternative to counts II, III, IV, V, and VI, if the second contract was with Kilgore, and is governed by the My Florida Marketplace standard terms and conditions, Kilgore contends defendant breached My Florida Marketplace's terms and conditions;

According to defendant, attachments to plaintiffs' complaint show that if there was an enforceable contract, it was between defendant and Essential. (Def. Mem. (DE 14) at 26 ("The attachments to the Complaint belie any allegation that FDEM entered into a contract with Kilgore or AI First.")). Where Rule 8(d), allows a plaintiff to plead alternate theories of a claim, and to make separate claims "regardless of consistency," dismissal of plaintiffs' alternative claims at this time is improper. Fed. R. Civ. P. 8.[4]

## CONCLUSION

Based on the foregoing, defendant's motion to dismiss, (DE 13), is DENIED. Pursuant to Rule 12(a)(4), defendants must serve a responsive pleading within 14 days of entry of this order.

SO ORDERED, this the 21st day of September, 2023.

LOUISE W. FLANAGAN
United States District Judge

---

[4] Plaintiffs provide in their response in opposition that if defendant "admits that it contracted with Essential . . . Plaintiffs will voluntarily dismiss Kilgore and AI First without prejudice from this lawsuit." (Pl. Resp. (DE 17) at 28).